## UNITED STATES BANKRUPTCY COURT
### EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

In the Matter of:

**SHANTA CORPORATION d/b/a
ST. ANNE'S CONVALESCENT
CENTER,**

          Debtor.

_____/

Case No. 15-44578

In Proceedings Under
Chapter 11

Hon. Thomas J. Tucker

## DECLARATION OF BRADLEY MALI
## IN SUPPORT OF FIRST DAY PLEADINGS

In support of the above-captioned Debtor's chapter 11 petition and its First Day Motions, I, Bradley Mali, declare as follows:

1.      Except as otherwise stated herein, I make this declaration upon personal knowledge and if called as a witness, could competently testify to the facts contained herein.

2.      I am the President and indirectly own and control 100% of the above-captioned Debtor.

3.      The Debtor filed a voluntary petition for relief (the "Chapter 11 Case") under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") on March 23, 2015 (the "Petition Date") in the Bankruptcy Court.

4.      The Debtor continues to operate its business and manage its assets as a debtor-in-possession pursuant to section 1107(a) and 1108 of the Bankruptcy Code.[1] I have been informed by counsel that no request has been made for the appointment of a trustee or examiner, and no official committee has been appointed to date by the office of the United States Trustee.

_____

[1] Unless otherwise noted to the contrary, all section references herein are references to sections of the Bankruptcy Code.

5.     This Declaration describes the business of the Debtor, the circumstances surrounding the commencement of Debtor's Chapter 11 Case, and relevant facts for the purposes of supporting the First Day Motions. Nothing herein is intended to be or should be construed as an admission of the validity of claims, security interests, liens, contractual defaults or any other rights or interests that may be asserted against any Debtor. The statements made herein regarding debts, obligations, defaults, and liens represent only assertions made by creditors of the Debtor or that the Debtor anticipates will be made by creditors and does not constitute a belief on the part of the Debtor that these assertions are true and/or accurate.

## BACKGROUND

### THE DEBTOR'S BUSINESS AND OWNERSHIP STRUCTURE

6.     The Debtor operates a fully-licensed, long-term skilled nursing care facility located in Detroit (the "Facility").

7.     The Debtor is wholly-owned by Fusion Holdings, LLC ("Fusion"), a Michigan limited liability company.

8.     Mission Point Management Services, LLC, a Michigan limited liability company ("Mission Point") is party to a Sub-Management Services Agreement with Corps Management LLC ("Corps"), which in turn is party to a Management Services Agreement with the Debtor, both dated December 1, 2013.

9.     Pursuant to the Sub-Management Services Agreement, and in the course of its work performed pursuant to that agreement, Mission provides the following services to the Facility: patient billing; receivables collection; processing of payables; accounting and bookkeeping; Medicare and Medicaid audit and reimbursement processing; payroll processing; employee relations and negotiation of collective bargaining agreements; vendor relations and contracting

(collectively, the "Services"). In exchange for the Services, Mission receives compensation from Corps equal to the total costs and expenses incurred by Mission with respect to the Services. Pursuant to the Management Services Agreement, the Debtor pays Corps $26,000 per month, from which Corps pays Mission pursuant to the Sub-Management Services Agreement.

10. I own all the member interests in Fusion and Corps.

11. The Debtor has 78 long-term, nursing-care beds at the Facility, approximately 65 of which are currently occupied, and it is capable of accepting Medicare, Medicaid and private pay residents. A variety of services are offered at the Facility, including without limitation, physical rehabilitation, skilled nursing care, wound care, hospice care, Alzheimer's and dementia patient care, tracheal and enteral services, and short-term respite care.

12. The Debtor currently employs 85 employees.

13. The Debtor owns the real estate upon which the Facility is located.

## EVENTS LEADING TO BANKRUPTCY

14. On February 22, 2012 ("First Petition Date"), the Debtor filed its first voluntary petition under the Bankruptcy Code contemporaneously with two affiliated debtors, which were jointly administered in this Court under Case No. 12-43956 ("First Case"). In the First Case, this Court entered an order confirming the debtors' *Second Amended Combined Plan and Disclosure Statement* [First Case, Docket Nos. 192-202] ("First Case Plan") on September 7, 2012.

15. Despite more favorable projections that supported the First Case Plan, the Debtor has experienced unsustainable unprofitability. As a result, the Debtor concluded in its reasonable business judgment that it must seek to sell its assets in a going concern sale, and hired Senior Living Investment Brokerage, Inc. (the "Broker") in August 2014 to assist it in such process.

16. The Broker prepared and solicited an offering memorandum. While several indications of interest have been received, they have not yet resulted in any purchase offers.

17.     The Debtor was required to file this Chapter 11 case (the "Second Case") at this time, however, as a result of threatened actions on the part of the IRS that could have halted operations and drastically impaired the value of the Debtor.

18.     The Debtor filed the Second Case as a means to accomplish the sale of its business as a going concern to a third party. The Debtor is filing concurrently herewith an Application to employ the Broker.

19.     The Debtor also plans to file within a short amount of time a motion to approve bidding procedures and to hold an auction for its business assets, as well as, subject to further order of this Court, a plan and disclosure statement to facilitate the orderly conclusion of this case.

### FIRST DAY MOTIONS

20.     To minimize the adverse effects of the bankruptcy filing on its business, the Debtor has requested "first day" relief (collectively, the "First Day Motions") that are intended to allow the Debtor to maintain its ongoing business operations and fulfill its duties as a debtor-in-possession.   I make this Declaration to assist the Court and other parties-in-interest in understanding the circumstances that compelled the Debtor to file the following First Day Motions:

> a.      *Debtor's First Day Motion for Entry of an Interim and Final Order Authorizing the Use of Cash Collateral and Granting Adequate Protection* (the "Cash Collateral Motion");
>
> b.      *First Day Motion for Entry of an Order (i) Authorizing Debtor to Pay Employee Obligations and Continue Employee Benefit Programs; (ii) Authorizing Debtor to Pay Certain Pre-Petition Tax Obligations, and (iii) Directing Financial Institutions to Honor Outstanding Employee-Obligation Payments* (the "Wage Motion"); and
>
> c.      *First Day Motion for Entry of an Order to Continue Using Pre-Petition Bank Accounts and Forms* (the "Bank Account Motion").

I believe the relief sought in each of the First Day Motions (i) is necessary for the Debtor to make a successful transition to and operate in chapter 11 with minimal interruption or disruption to its business, (ii) constitutes a key factor in maximizing and preserving the value of the Debtor's estate; and (iii) is therefore necessary to avoid immediate and irreparable harm to the Debtor.

I.   **The Debtor's First Day Motion for Entry of an Interim and Final Order Authorizing the Use of Cash Collateral and Granting Adequate Protection (the "Cash Collateral Motion")**

21.   The Debtor anticipates that Green Mountain Finance Fund, LLC ("Green Mountain") may assert a security interest in the Debtor's Cash Collateral in the estimated amount of $2,750,000.00. The Debtor further anticipates that Green Mountain may assert that it is an over-secured creditor and that its security interests and liens have first priority over all other security interests and liens asserted against the Debtor.

22.   The Debtor also anticipates that the Internal Revenue Service ("IRS") may assert a security interest in the Debtor's Cash Collateral securing federal tax obligations in the estimated amount of $2,782,953.05. The Debtor further anticipates that the IRS may assert that its security interests and liens have first priority over all other security interests and liens asserted against the Debtor.

23.   The Debtor anticipates that the Plan Monitor established pursuant to the First Case Plan confirmed in the First Case may also assert a security interest in the Debtor's Cash Collateral in the estimated amount of $130,028.71, which, without limitation, upon information and belief would be junior to the interests of Green Mountain and the IRS.

24.   The Debtor anticipates that other parties may also assert a security interest in the Debtor's Cash Collateral, which, without limitation, upon information and belief would be junior to all other interests and would be wholly under-secured.

25.     The Debtor believes that no entities other than as described above (the "Secured Creditors") have an interest in cash collateral.[2]

26.     The Debtor makes no admission and takes no position at this time regarding the validity, enforceability, priority or perfection of any the obligations, security interests and liens that may be asserted by any of the Secured Creditors.

27.     On the Petition Date, the Debtor, without admission, believes that its cash collateral, as defined in 11 U.S.C. §363 (the "Cash Collateral") consists of the following:

a.  accounts receivable having a face value of approximately $1,708,259 as of March 17, 2015;[3] and

b.  Deposit accounts having an aggregate balance of $11,452.85 as of March 23, 2015.

28.     The Debtor requires the use of cash collateral to make such payments as are necessary for the continuation of its business, as shown on **Exhibit A** to the Cash Collateral Motion (the "Budget").

29.     The Budget was prepared by Mission Point in consultation with me and is based on the Debtor's historical revenues and expenses.

30.     The Budget projects the anticipated revenue and expenses of the Debtor, and demonstrates the amount of funds that the Debtor must expend on its operations in order to avoid immediate and irreparable harm to the estate.

31.     During the first thirty (30) days of this case, the Debtor projects that it will need to spend $358,574.31 to avoid immediate and irreparable harm.

---

[2] The State of Michigan may assert an interest in Cash Collateral through setoff rights securing the payment of certain bed taxes, withholding tax and unemployment insurance taxes. Because the Debtor proposes paying the current portion of those taxes pursuant to its First Day Motion to Pay Employee Obligations and Certain Pre-petition Tax Obligations, the Debtor believes that a determination of whether the State of Michigan may be secured will be unnecessary.

[3] A copy of the Debtor's Accounts Receivable aging report is attached as **Exhibit C** to the Cash Collateral Motion.

32. Without the ability to make payments as set forth in the Budget, the Debtor will be unable to ensure the continued operation of its business. A substantial portion of the value of the business as a going concern arises from its ability to provide all the goods and services needed on a daily basis to operate a nursing home, such as medications, therapy, food, laundry and employees.

33. Based on the Budget, the Debtor expects to be nominally profitable during the first 30 days of the case and will thereby be able to provide its secured creditors, such as the IRS and the Green Mountain with adequate protection of their interests in the Debtor's cash collateral by (i) providing replacement liens on the cash collateral to the same extent and with the same priority as existed prepetition, (ii) providing monthly payments of $7,063.91 to Green Mountain and $3,296.00[4] to the IRS, and (iii) paying all current portions of the taxes.

**II.      First Day Motion for Entry of an Order (i) Authorizing Debtor to Pay Employee Obligations and Continue Employee Benefit Programs; (ii) Authorizing Debtor to Pay Certain Pre-Petition Tax Obligations, and (iii) Directing Financial Institutions to Honor Outstanding Employee-Obligation Payments (the "Wage Motion")**

34. The Wage Motion seeks entry of an order (a) authorizing Debtor, in its sole discretion, to pay and honor the Employee Obligations and Employee Benefit; (b) directing Debtor's banks and other financial institutions to receive, process, honor, and pay all checks and electronic payments related to the Employee Obligations and Employee Benefits; (c) authorizing, but not directing, the Debtor to pay the Current Bed Tax, and any future Bed Tax payments, including for any amounts that arose in the pre-petition period during the month of March 2015; and (d) permitting the Debtor to change or discontinue and implement new Employee Obligations or Employee Benefits in their sole discretion and without further approval of the Court.

---

[4] This amount is equal to the amount of interest payable to the IRS each month.

35.     As of the Petition Date, the Debtor, employs 85 employees (the "Employees")[5] in the ordinary course of its business and incurs obligations to them for compensation for their services.

36.     Forty-one (41) of the Employees (the "Union Employees") are members the Service Employees International Union (the "Union").[6]

37.     One (1) Employee, Bradley Mali ("Mr. Mali") is an Insider (as defined in 11 U.S.C. Section 101(31) of the Bankruptcy Code).

38.     The Debtor has costs and obligations in respect of the Employees relating to the period before the Petition Date, as set forth specifically below. Certain of these costs and obligations are outstanding and due and payable, while others will become due and payable after the Petition Date in the ordinary course of the Debtor's business.

39.     Before the Petition Date, and in the ordinary course of business, the Debtor typically paid obligations relating to wages (the "Wages") every two (2) weeks on Monday for the two week period ending eight days earlier. The Debtor pays the Wages by check.

36.     On March 30, 2015, the Debtor will have to fund payroll for its Employees ("March 30 Payroll") estimated at $91,000.[7] The time period for the March 30 Payroll is March 8 through March 21, 2014, which includes thirteen days of prepetition Wages. The entire March 30 Payroll is attributable to the prepetition period.

37.     In addition to the March 30 Payroll, the Debtor will have to fund payroll for its Employees ("April 13 Payroll") estimated at $91,000.[8] The time period for the April 13 Payroll is

---

[5] The term Employees shall also be deemed to include any former Employees who are still receiving Employee Obligation or Employee Benefit payments, such as, for example, accrued vacation time.
[6] Unless otherwise noted, Union Employees and non-Union Employees receive the same Employee Benefits.
[7] Of this amount, $1,730.77 is attributable to Mr. Mali.
[8] Of this amount, $1,730.77 is attributable to Mr. Mali.

March 22 through April 7, 2015, which includes two days of prepetition Wages. The Debtor estimates that $19,500 of the April 13 Payroll is attributable to the prepetition period – March 22 through the Petition Date.

40.    Additionally, the Debtor is required by law to withhold from its Employees' Wages amounts related to federal, state, and local income taxes, as well as social security and Medicare taxes (collectively the "Withholding Taxes") and to remit the same to the appropriate taxing authorities (collectively the "Taxing Authorities").

41.    In addition, the Debtor is required to make matching payments from its own funds on account of social security and Medicare taxes, and to pay, based on a percentage of gross payroll and subject to state-imposed limits, additional amounts to the Taxing Authorities for, among other things, state and federal unemployment insurance (collectively the "Employer Payroll Taxes" and, together with the Withholding Taxes, the "Payroll Taxes").

42.    The Employees incur various expenses in the discharge of their ordinary duties, such as travel and meal expenses. Because these expenses are incurred as part of their official duties and in furtherance of the Debtor's business, the Debtor reimburses the Employees in full for these expenses (the "Expense Reimbursements")[9], subject to the submission of proper documentation to the appropriate accounting department.

43.    A majority of Expense Reimbursements are travel-related expenses related to sales or client development. The Debtor reimburses expenses on a rolling basis, with a time lag of up to two weeks between submission or the request for reimbursement and payment. It is difficult to determine what Expense Reimbursements that accrued prepetition are outstanding on the Petition Date because of the lag time in the submission of such requests. However, based upon historical

---

[9] Expense Reimbursement, Payroll Taxes, Withholding Taxes, and Wages are collectively referred to as "Employee Obligations").

figures, the Debtor estimates that it has no more than $500 in prepetition Expense Reimbursements outstanding as of the Petition Date.

44.     In the ordinary course of its business, the Debtor established certain employee benefit programs (collectively the "Employee Benefits"), including without limitation, paid time off and medical insurance programs.

45.     Under its paid time off program (the "PTO Plan"), eligible employees are entitled to receive paid vacation and personal days based on seniority and attendance. Many of the Employees are entitled to unused vacation and personal days based on their prepetition service.

46.     Further, the Debtor provides reasonable paid bereavement and jury duty leave to eligible full-time Employees.

47.     Additionally, the Debtor sponsors several health and welfare plans to its employees, including medical insurance.

48.     Medical insurance is provided to the Employees through Total Health Care. The Debtor pays a portion of the health insurance expenses for all Union Employees and certain non-Union Employees, and the participating Employees pay the remaining balance through deduction from their Wages. The Debtor withholds approximately $1,400 per month in the aggregate from the Employees' Wages on account of medical insurance, which amount is a paid monthly together with Debtor's portion to the medical insurer, estimated at $13,000 per month.

49.     The Debtor also offers its Employees access to various visions, dental, life, and accidental death, dismemberment insurance and flex spending accounts (the "Supplemental Benefits"), which are funded entirely through Employee Wage deductions, which are paid monthly to the applicable insurer.

50.     The laws of the State of Michigan require the Debtor to maintain workers'

compensation policies and programs to provide the relevant Employees with coverage for claims arising from or related to their employment with the Debtor (the "Workers' Compensation Programs"). The annual premium for the Debtor's Workers' Compensation policy from October 8, 2014 through October 7, 2015 is $61,930.40, which is paid in advance over ten (10) months at $6,500.00 per month

51.     Pursuant to sections 363(b) and 105(a) of the Bankruptcy Code, the Debtor seeks authority to, in its sole discretion, (i) continue the Workers' Compensation Programs on an uninterrupted basis, consistent with the Debtor's practices prior to the Petition Date, and (ii) make all premium, administrative fee, claim and other payments for obligations related to the Workers' Compensation Programs, including the prepetition amounts described above.

52.     The Debtor also withholds certain amounts from Union Employee's Wages to be paid to the Union (the "Union Dues".)

53.     Specifically, the Debtor currently withholds approximately $1,500 per month in the aggregate from Union Employees' Wages for Union Dues and remits such amounts to the Union (the "Union Dues Withholdings"). As of the Petition Date, the Debtor estimates it holds approximately $1,500 in accrued and unpaid prepetition obligations with respect to the Union Dues, which the Debtor seeks authority to pay in the ordinary course of business.

54.     Michigan Public Act 303 established the Michigan Medicaid Quality Assurance Assessment ("MMQAA"). The MMQAA provides for what is known as a "bed tax," or a fee on health care providers that is used to generate more federal Medicaid matching funds (the "Bed Tax"), resulting in a net gain for some but not all of the providers. With respect to the Bed Tax, the Debtor receives certain funds from the state on a monthly basis and is required to pay a Bed Tax back to the State certain amounts at the end of every month.

55. While the Debtor is approximately $463,173.00 in arrears with its Bed Tax, it currently has the ability to pay the current monthly amount of $43,376.93 (the "Current Bed Tax"). The Debtor hereby also requests authority from this Court to pay the Current Bed Tax, and any future Bed Tax payments relating to any amounts that arose prior to the Petition Date (*i.e.* for the month of March 2015 prior to the Petition Date.)

56. The Debtor believes that continuing to make the current Bed Tax payments is critical to preserving their on-going relationship with the State of Michigan and facilitating the continuation of the Bed Tax payments which is an important revenue source for the State. Delay in paying the Current Bed Tax could disrupt the post-petition Bed Tax payments, harming the Debtor and the State.

**III. First Day Motion for Entry of an Order to Continue Using Pre-Petition Bank Accounts and Forms**

57. Pre-Petition, the Debtor maintained the following accounts (collectively referred to herein as the "Accounts"):

| BANK NAME | ACCOUNT NUMBER | PURPOSE |
|---|---|---|
| Flagstar | 113830401 | Payroll |
| Flagstar | 112517787 | General |
| Charter One | 3670351432 | General (not used since October 2014) |

58. The Debtor utilizes its Accounts for all aspects of its operations and receives Medicare and Medicaid reimbursement payments via electronic payments.

59. When a facility changes accounts for purposes of receiving Medicare and Medicaid reimbursement payments, there is a several-week period during which the old account will receive reimbursement payments for periods prior to the account change, and before the new accounts start receiving payments.

60. I have been informed by counsel that this Court and the Office of the United States Trustee have established certain operating guidelines for debtors-in-possession in order to supervise the administration of chapter 11 cases. These guidelines require chapter 11 debtors to, among other things: close all existing bank accounts and open new debtor in possession ("DIP") bank accounts in certain financial institutions designated as authorized depositories by the U.S. Trustee; establish one DIP account for all estate monies required for the payment of taxes (including payroll taxes); maintain a separate DIP account for cash collateral; and obtain checks for all DIP accounts that bear the designation, "debtor in possession," the bankruptcy case number, and the type of account.

61. I have been further informed that the guidelines also require debtors to close their books and records as of the petition date and to open new books and records to reflect all post-petition operations. These requirements are designed to provide a clear line of demarcation between prepetition and post-petition transactions and operations, and to prevent the inadvertent post-petition payment of prepetition claims.

62. The Debtor will suffer a potential delay in receiving Medicare and Medicaid reimbursement payments resulting from the closing the Accounts and opening new accounts will seriously disrupt its operations by, among other things, delaying the purchase of necessary supplies (including medicine) from its vendors on a daily, continual basis to meet the needs of its clients.

63. Additionally, the Debtor also uses a variety of business forms. In order to minimize expenses to the estate, and to minimize disruption of its businesses, the Debtor also requests that it be authorized to continue to use all correspondence, business forms (including, but not limited to, letterhead, stationary, purchase orders, employment applications, invoices, etc.) and checks in the form that they exist immediately prior to the Petition Date (collectively, the "Business Forms"),

without reference to the Debtor's status as a debtor-in-possession. Use of new business forms would increase the Debtor's costs and add to the administrative burdens of transitioning to operations under chapter 11.

## IV.   Conclusion

64.     The Debtor filed the Second Case as a means to accomplish the sale of its business as a going concern to a third party. The Debtor is filing concurrently herewith an Application to employ the Broker.

65.     The Debtor also plans to file within a short amount of time a motion to approve bidding procedures and to hold an auction for its business assets, as well as, subject to further order of this Court, a plan and disclosure statement to facilitate the orderly conclusion of this case.

66.     In this manner, the Debtor hopes to satisfy the claims of its creditors to the greatest extent possible, while contemporaneously maintaining 85 jobs and providing quality health care for its patients.

Pursuant to 28 U.S.C. § 1746, I declare to the best of my knowledge, under penalty of perjury, that the above statements are true and correct.

Dated: March 24, 2015

BRADLEY MALI